# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CAUSE NO. EP-24-CR-01370-KC |
| | § | |
| YOHANGEL MARTINEZ GONZALEZ, | § | |
| | § | |
| Defendant. | § | |

## UNITED STATES' RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS AND TO DISMISS WITH BRIEF IN SUPPORT

The United States of America by and through the United States Attorney for the Western District of Texas and the undersigned Assistant United States Attorney, respectfully submits the Government's Response to Defendant's Motions to Suppress and to Dismiss ("Motion") (ECF No. 18) in the above entitled and numbered cause and would respectfully show as follows:

### I. SUMMARY OF THE FACTS

The following facts are taken from federal agents' government reports and preliminary interviews with the law enforcement officers involved. On May 30, 2024, Border Patrol agents received information from fellow agents that a residence in Socorro, Texas was being used to harbor aliens. Agents identified 11161 Perlette St., Socorro, Texas, which is in the Western District of Texas, as an alien stash house after examination of phone data and from interviews after a foiled alien smuggling scheme. The address has two separate one-story apartment units placed next to each other. After the failed alien smuggling scheme agents set up a pole camera near the residence.

On June 6, 2024, at approximately 6:27 AM agents observed, via the pole camera, a red Jeep Wrangler and a small grey sedan arrive at the location. The Jeep stopped momentarily however the driver then repositioned the vehicle so it could be closer to the front door of the residence. After the vehicle was finally parked, several subjects are seen walking up to the Jeep, then opening the doors to allow approximately four (4) suspected aliens to exit the vehicle. The suspected aliens were wearing dark clothing. They exited the vehicle and entered the second single-story apartment unit.

Later that morning, at approximately 10:15 AM, Border Patrol agents Luis Silva, Jesus Rodriguez, James De Anda, Jaime Leon, Mariana Silva-Figueroa and Alfredo Martinez arrived at 11161 Perlette St. to further investigate. Agents Luis Silva and Jesus Rodriguez approached the front door, while Agents Mariana Silva-Figueroa and James De Anda remained towards the front and side of the two apartment units and next to the driveway. Agents Silva and Rodriguez were able to see through an open window. Agents saw a female on an inflatable mattress that appeared to be in distress. Agents noted that the temperature high for that day was over 105 degrees Fahrenheit.

Agent Silva knocked on the front door and announced himself as an illegal alien driver, while Agent Rodriguez stood next to him to act as the alien. The Defendant, Yohangel Javier Martinez-Gonzalez, answered the door but left the metal screen door closed. Agent Silva and the Defendant communicated in the Spanish language. Agent Silva, while posing as a driver, stated he was there to drop off a "caja", which is a common term used by smugglers to describe an illegal alien. The Defendant responded and asked, "who is this from and what is the code". Agent Silva stated that "Wero" had sent him to drop off one (1) subject. Agent Silva asked the Defendant if this was the stash house. The Defendant stated "Yes it is but I don't know who you are". The

2

Defendant stated he had to check first and began making a phone call on his cell phone. The Defendant returned to the door and advised Agent Rodriguez (posing as the alien) that he could stay but that Agent Silva (posing as a transporter) had to leave because he did not know who he was. Agent Silva, still posing as a driver, asked the Defendant to open the door so Agent Rodriguez, still posing as an alien, could enter and so he could take a 'proof of life' video. The Defendant again pulled out his phone and this time appeared to be on a video call with someone. He appeared to be videoing the agents. During the encounter the agents could see an inflatable mattress and a small couch, but no other furniture. Agents also noticed a strong odor of trash and body odor coming from inside the apartment.

Agent Silva then displayed his service issued badge and identified himself as a Border Patrol agent. The Defendant then tried to exit through an open window in the rear. Agent Silva signaled to the other agents that the Defendant was attempting to flee. Agents Silva-Figueroa and De Anda then ran to the rear in case the Defendant was able to exit through a rear window. The Defendant saw there were agents outside and returned inside the residence. The Defendant then voluntarily returned to the front door. The agents advised they were conducting an immigration investigation. Agent Silva advised the Defendant that he just needed to see if there were aliens inside. He told the Defendant that if there weren't any then he would leave. While the Defendant was inside the residence, Agent Silva, who was still outside, asked him for consent to enter. The Defendant remained quiet and walked away from the door and out of the agents view into a blind spot in the living room. Moments later the Defendant returned to the front door but this time without his cell phone in hand.

The Defendant, while still inside the residence, told Agent Silva that he could come inside. Agent Silva responded that the Defendant would need to open the door for him. The Defendant

3

then opened the door and again advised Agent Silva that he could come inside. Agent Silva responded that the Defendant needed to exit the residence first before he can go inside. The Defendant then exited the residence voluntarily and was placed in handcuffs for safety reasons. Agents entered the residence and located seventeen (17) subjects inside. All seventeen subjects were determined to be aliens to the United States without any documentation that would allow them to enter or remain in the United States legally. After being placed under arrest the Defendant was advised of his *Miranda* rights. The Defendant then requested an attorney.

The Defendant was subsequently arrested and charged with committing the criminal offense of 8 U.S.C. § 1324 (a)(1)(A)(v)(I), (a)(1)(A)(iii) and (a)(1)(B)(i) –Conspiracy to Harbor Aliens. *See* (ECF No. 1). On July 1, 2024, a Grand Jury sitting in the Western District of Texas returned a two-count indictment against the Defendant for 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(iii) and (a)(1)(B)(i) – Conspiracy to Harbor Aliens (Count 1); and 8 U.S.C. §§ 324(a)(1)(A)(iii) & (a)(1)(B)(ii) – Harboring Aliens (Count 2). (ECF No. 11). On August 21, 2024, the Defendant filed the instant Motion asking the Court to suppress any evidence because of the agents alleged coercive "knock and talk". (Def. Mot. Suppress, ECF No. 18). The Defendant further seeks dismissal based on the agents conduct. *Id* at 5-7.

## II.  ISSUES

The Defendant moves for suppression of all physical and testimonial evidence because he contends they were the product of an illegal seizure in violation of the Fourth Amendment. The Defendant further moves for dismissal based on outrageous conduct by the agents.

## III. ARGUMENT AND AUTHORITIES

Defendant claims law enforcement conducted a coercive "knock and talk" which ultimately led to an illegal seizure of the Defendant and illegal search of the residence. (Def. Mot. Suppress, ECF No. 18 at 4-5).

### A. Authority

The Fourth Amendment prohibits unreasonable searches and seizures. Absent a search warrant or consent, the Fourth Amendment requires a search or seizure be supported by probable cause and necessitated by exigent circumstances." *United States v. Carillo–Morales*, 27 F.3d 1054, 1061 (5th Cir.1994)). The purpose of the Fourth Amendment is "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," and not to eliminate all contact between police and citizens. *United States v. Martinez–Fuerte*, 428 U.S. 543, 554 (1976); *see also Terry v. Ohio*, 392 U.S. 1 (1968).

"Federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). "The purpose of a knock-and-talk investigation is to make investigatory inquiry, or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search". *United States v. Hernandez*, 392 Fed. Appx. 350, 352 (5th Cir. 2010) (citations and internal quotations omitted). "The purpose ... is not to create a show of force, nor to make demands on occupants, nor to raid a residence." *Id.*

Even when an officer conducting a "knock and talk" procedure fails to secure the resident's voluntary consent to search there is no rule requiring that an officer end the encounter immediately. So long as the officer is not prolonging his questioning or presence solely to avoid the warrant

requirement. *United States v. Rodea*, 102 F.3d 1401, 1409–10 (5th Cir.1996). A "knock and talk" can aid in the development of probable cause at which point the officer may conduct a warrantless search and seizure when exigent circumstances exist. *Jones*, 239 F.3d at 720-22.

During a "knock and talk" officers may seek an occupant's consent to search the property. Warrantless searches are not unreasonable under the Fourth Amendment if consent is given to conduct them. *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir.1995). The government must show that the consent was given voluntarily and that either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent. *Id.* The voluntariness of the consent is a question of fact to be determined based on the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973)).

There are several factors to be considered relating to voluntariness: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988). No single factor is controlling. *Id.*

**B.     The Agents Approach was Reasonable and Consent was Voluntarily Given by the Defendant**

The agents developed probable cause while acting in an undercover capacity such that had the Defendant declined to provide consent, agents would be able to secure a search warrant. A prior investigation revealed the residence to be a possible stash house. A pole camera captured two vehicles dropping off subjects wearing dark clothing. Agents detected a distinct body order and

6

trash smell emanating from the apartment. They observed very little furniture only seeing a small couch and an inflatable mattress. These observations are consistent with alien smuggling activity. Further, the Defendant, skeptical of the agent's rouse, admitted that the property was in fact an alien stash house and twice attempted to confer with an unknown person or persons to confirm the identity of the agents and determine the truthfulness of their statements. Lastly, he attempted to flee once agents identified themselves as Border Patrol agents.

The agent's conduct was lawful and reasonable under the circumstances. Prior to arriving at the residence, the agents believed that alien smuggling activity was occurring there. Prior interviews alien transporters and cell phone evidence revealed the apartment was being used as an alien stash house. To further the investigation, agents set up a pole camera video near the residence. On the date of the operation agents observed, via the pole camera, four suspected aliens being dropped off at the residence. Agents believed the four subjects were aliens and that the residence was a stash house because the driver of the Jeep Wrangler repositioned the vehicle so it would be closer to the door of the residence thereby minimizing the distance required to walk to enter the residence. The video then shows additional subjects approach the Jeep and open its doors which allowed the four subjects, all wearing dark clothing, to exit the vehicle and enter the apartment.

Next, the agents drove down the dirt path leading to the residence parking in front of the second apartment unit. Agent Silva knocked on the front door and announced himself as an illegal alien driver, while Agent Rodriguez stood next to him to pose as the alien. "It is well-established that the use of informants and undercover agents is permissible in government investigations". *United States v. Alvarado-Machado*, 867 F.2d 209, 211 (5th Cir. 1989) (citing *Sorrells v. United States*, 287 U.S. 435, 441 (1932)). Border Patrol agents in this district routinely act in an undercover capacity in furtherance of alien smuggling investigations. *See e.g. United States v.*

*Carmona-Ramos*, 638 Fed. Appx. 351 (5th Cir. 2016) (El Paso Border Patrol agents apprehended an alien and began using his cell phone to communicate with a human smuggler coordinator who in turn sent the defendant to pick up the agent posing as an alien). The same investigative technique is also used by narcotics agents. *See e.g.* Le*wis v. United States*, 385 U.S. 206 (1966) ("Misrepresentation by a police officer or agent concerning the identity of the purchaser of illegal narcotics is a practical necessity"). Agent Silva would testify that he routinely acts in an undercover capacity as an alien smuggler and alien to further alien smuggling investigations.

Next, while agents Silva and Rodriguez were at the front door, agents Mariana Silva-Figueroa and James De Anda were posted at the side of the residence but towards the front. They did check the rear of the residence but did not lie in wait at the rear. They went to the rear of the residence after Agent Silva signaled that the Defendant was attempting to flee out a back window. There was no fence or other obstruction preventing the agents from walking to the rear of the apartment. The area around the two units can be appropriately described as a common area that is shared by both apartment units. The agents' entry into the rear was a "mere breach of the home's curtilage, not a full-scale storming of the home's interior". *United States v. Trejo*, 378 Fed. Appx. 441, 448 (5th Cir. 2010) (Officers entered the backyard of a residence during a "knock and talk" operation). The purpose of the agents positioning themselves at the rear of the residence was not to raid the home to search for evidence, but to ensure officer safety. *Id; See also Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (noting that the purpose and flagrancy of the official misconduct are "particularly" important). The agents had already seen four subjects enter the residence hours before. They also observed several other subjects who appeared to be aiding in the smuggling scheme helping to guide those four subjects inside the apartment. Lastly, the Defendant also

attempted to flee after agents revealed themselves as Border Patrol agents. Ultimately, seventeen occupants were found inside the residence compared to the six (6) Border Patrol agents on scene.

The agents, sensing that their rouse was nearing conclusion, revealed themselves as Border Patrol agents to the Defendant. The Defendant then attempted to flee through an open window at the rear. The agents did not demand that he stop and return to the door. The Defendant voluntarily began speaking with the agents again. The agents did not threaten or demand that the Defendant come speak with them. The agents advised they were conducting an immigration investigation and asked the Defendant, while he was still inside the residence, if he would allow agents to enter the residence to check for aliens. The agent further advised the Defendant that if no aliens were found the agents intention was to leave.

Given the totality of the circumstances and in evaluating the voluntariness factors, the Defendants consent to search was voluntarily given:

*(1) the voluntariness of the defendant's custodial status;*

The Defendant's custodial status was voluntary. *See Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968) ("[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The Defendant was not in custody. The Defendant was inside the residence behind a closed door; he was not handcuffed; the agents did not demand that he come to or open the door; agents did not draw their weapons or otherwise threaten the Defendant. The Defendant was free to ignore the agents and close the door. In fact, the Defendant did ignore agent Silva during the encounter. He initially ignored agent Silva, left out of view, left his cell phone in another room and then returned to the front door. Agent Silva would testify that had the Defendant opened the door while he was still undercover, he would still

reveal himself as a Border Patrol agent and still seek consent to enter the residence. This factor, therefore, weighs against the Defendant.

*(2) the presence of coercive police procedures*

There is no evidence that the agents used coercive tactics, or that they took unlawful advantage of the situation to obtain the Defendants consent. As previously stated, there is no prohibition on Border Patrol agents acting in an undercover capacity. *United States v. Alvarado-Machado*, 867 F.2d 209, 211 (5th Cir. 1989) (citing *Sorrells v. United States*, 287 U.S. 435, 441 (1932)).

Next, the Defendant was not handcuffed, no threats or violence were used, and there was no overt display of authority. Further, there is no evidence that the agents' requests were made in an intimidating manner. "[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent". *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973).

The number of agents also does not suggest that the Defendants consent was involuntary. The Fifth Circuit has held consent to be voluntary even in the face of greater shows of force than the presence here of six agents, none with weapons drawn or displaying force beyond their presence in numbers. *See United States v. Solis*, 299 F.3d 420, 438 (5th Cir.2002) (presence of seven police officers at defendant's residence when he signed form consenting to search was not shown to have overborne defendant's will.); *see also Jones* at 724 (defendants will was not overborn by presence of ten FBI agents during the search of a residence). This factor, therefore, weighs against the Defendant.

*(3) the extent and level of the defendant's cooperation with the police;*

The government would describe the Defendants cooperation as neutral. He repeatedly stated that agents could come inside and voluntarily opened the door to the residence after agents revealed themselves. He complied with commands and did not resist the agents when they placed handcuffs on him. He chose to remain silent and declined to answer the agents' questions after being advised of his *Miranda* warnings but was not antagonistic with agents during the encounter. This factor, therefore, is relatively neutral.

*(4) the defendant's awareness of his right to refuse consent*

While the Defendant was still inside the residence, Agent Silva explained to the Defendant that he was just looking for aliens and that if none were inside then he would leave. There is no indication that agents informed the Defendant of his right to refuse consent. It is a factor to consider but there is no requirement that the government prove that the Defendant knew he could refuse. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). Further, the fact that the Defendant was not specifically told he could refuse does not support a finding of involuntariness. *United States v. Jenkins*, 46 F.3d 447, 453 (5th Cir. 1995) ("fact that he may not have been specifically told "you may refuse to cooperate" does not provide much, if any, indicia of involuntariness"). This factor, therefore, is relatively neutral.

*(5) the defendant's education and intelligence*

At the time of the incident the Defendant was 23 years old. He is a citizen and national of Venezuela. There is no evidence that the Defendant was of below average intelligence or that he was otherwise deficient in his ability to understand the agents. Next, based upon the conversation between the Defendant and the agents, both while they were undercover and after they revealed

themselves, it is apparent that the Defendant understood them. The evidence does not indicate that he was lacking the requisite education or intelligence to give valid consent to a search. This factor, therefore, weighs against the Defendant.

*(6) the defendant's belief that no incriminating evidence will be found.*

Once the agents revealed themselves the Defendant immediately attempted to flee. This indicates that the Defendant was aware that the agents would find incriminating evidence, namely, human beings, inside the residence. The government would argue that that the Defendant could have consented because he knew the agents would find the aliens. Agent Silva also told the Defendant that he was just looking for aliens and that if none were present, he would leave. This factor is not sufficiently significant to indicate the Defendants consent was involuntarily given.

An evaluation of the six factors suggests the Defendant voluntarily consented to having the agents search the residence. Therefore, the Defendants Motion should be denied.

**C.    Assuming a Constitutional Violation Occurred the Inevitable Discovery Doctrine Applies**

Additionally, and in the alternative, if the Court were to find a constitutional violation by Border Patrol agents, the evidence would still be admissible under the inevitable discovery doctrine. "The inevitable-discovery doctrine is a limit on the Fourth Amendment's exclusionary rule." *United States v. Walker*, 49 F.4th 903, 909 (5th Cir. 2022). "It provides that 'otherwise suppressible evidence [will be admitted] if that evidence would inevitably have been discovered by lawful means.' *Id.* (quoting *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010)).

The government is required to prove, by preponderance of the evidence, that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the government was actively pursuing a substantial

alternate line of investigation at the time of the constitutional violation. *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir.1991) (citing *United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir.1985)).

In this case there is a reasonable probability that the evidence would have been discovered by lawful means. Agents arguably had developed probable cause that the harboring of aliens was occurring prior to approaching the residence. A foiled alien smuggling scheme revealed the residence to be an alien stash house and cell phone evidence obtained from that event provided corroboration. Hours before the alleged misconduct, agents observed two vehicles dropping off multiple subjects wearing dark clothing. The driving behavior was also suspicious as the driver repositioned the vehicle to be closer to the door. Agents would have discovered the seventeen aliens and the Defendant through the means of a search warrant based on the above probable cause.

Alternatively, it is not unreasonable to conclude that the agents would have still developed the additional probable cause had they conducted the knock and talk straight away and not acted undercover. Even if the Defendant had refused to come to the door or refused to provide consent the agents would still have observed the female who appeared to be in distress from the high temperatures. They still would have smelled body odor and trash from the open windows. They still would have seen the lack of furniture in the residence. The same observations would further support the issuance of a search warrant.

Next, the government was actively pursuing a substantial alternate line of investigation. As mentioned previously, agents set up a pole camera near the residence in the hopes of capturing illegal activity and identifying other participants. The continued electronic surveillance would have revealed additional vehicles, drivers and suspected aliens arriving and leaving the residence.

With this information agents could develop additional targets of investigation and could potentially conduct traffic stops on vehicles arriving or leaving the residence.

If the Court does find a constitutional violation by Border Patrol agents, the government believes such evidence should still be admissible under the inevitable discovery doctrine.

**D.     The Agents Conduct Does Not Rise to the Level to Warrant Dismissal**

The Defendant seeks dismissal of the case as a form of relief. *See* (Def. Mot. Suppress, ECF No. 18 at 5-7). The supervisory powers of the district court allow it to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations. *United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir.1979*)*. Dismissal of the case would be an unnecessarily harsh remedy. "Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). Such a violation will only be found "in the rarest circumstances." *Johnson*, 68 F.3d at 902 (citing *United States v. Yater*, 756 F.2d 1058, 1066 (5th Cir.) (1985)*.* "Dismissal of an indictment with prejudice is a rare result because, even in the face of prosecutorial misconduct, there is a 'public interest in having indictments prosecuted.'" *United States v. Swenson*, 894 F.3d 677, 685 (5th Cir. 2018) (quoting *United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988)

The Fifth Circuit has expressly declined to "foreclose the possibility that governmental ineptitude and carelessness could be so abhorrent as to warrant a dismissal with prejudice…the government's mistakes did not reach an abhorrent level". *United States v. Fulmer*, 722 F.2d 1192, 1196 (5th Cir. 1983). "The standard for proving outrageous governmental conduct is extremely demanding." *United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009). Therefore, "a district

court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant." *United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983).

Border Patrol agents acting in an undercover capacity does not rise to the level of outrageous conduct. "Merely setting a trap to catch a "coyote" (a smuggler of illegal aliens) … is not in itself outrageous." *United States v. Alvarado-Machado*, 867 F.2d 209, 211 (5th Cir. 1989) (government used aliens to act as informants for INS to arrest transporters).

The Fifth Circuit has reviewed similar challenges. "[A] common thread running throughout our rejection of outrageous conduct claims is that one who is an active and willing participant in the criminal conduct which gave rise to his arrest cannot later complain of outrageous governmental conduct. *Alvarado-Machado*, 867 F.2d at 212 (citing *United States v. Miller*, 799 F.2d 985, 988–89 (5th Cir.1986); and *United States v. Yater*, 756 F.2d 1058, 1065–66 (5th Cir.1985)). The Defendant was an active and willing participant. He immediately asked the agents for the code word and began attempting to verify the legitimacy of the code word with other un-indicted co-conspirators. Further, he was already actively committing a criminal offense, the harboring of aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), when agents approached the residence.

The cases cited by the Defendant are factually distinguishable as they involve the execution of a search warrant. *Garza v. State*, 632 N.W.2d 633, 636 (Minn. 2001) (police officers were executing a search warrant that authorized an "unannounced entry"); *State v. Sakellson*, 379 N.W.2d 779, 781 (N.D. 1985) (officers did not "knock, ring the doorbell, or otherwise announce their presence" prior to entering the residence to execute a search warrant).

The actions of the Border Patrol do not rise to the level of gross negligence nor abhorrent

carelessness. Nor can it be said to have actually prejudiced the Defendant. Lastly, the Defendant was an active participant in the criminal conduct. Therefore, the Court should deny the Defendants Motion.

## IV. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Government respectfully requests that the Defendant's Motion to Suppress and Motion to Dismiss be denied in their entirety.

                        Respectfully submitted,

                        JAIME ESPARZA
                        UNITED STATES ATTORNEY

By:   /s/Mathew Engelbaum
       MATHEW ENGELBAUM
       Assistant U.S. Attorney
       Texas Bar #24097653
       700 E. San Antonio, Suite 200
       El Paso, Texas 79901
       (915) 534-6884

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

 /s/Mathew Engelbaum
Mathew Engelbaum
Assistant U.S. Attorney

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CAUSE NO. EP-24-CR-01370-KC |
| YOHANGEL MARTINEZ GONZALEZ, | § § § § | |
| Defendant. | § § | |

## **ORDER**

On this date, came on to be considered the Defendant's Motion to Suppress and Motion to Dismiss in the above entitled numbered cause. The Court having considered the same, is of the opinion that said Motions should be denied.

IT IS THEREFORE ORDERED that the Defendant's Motions to Suppress and Motion to Dismiss be DENIED.

SIGNED and ENTERED this _____ day of _____, 2024.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE