IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| v.  § | CAUSE NO. EP:24-CR-1370-KC |
| § | |
| (1) YOHANGEL JAVIER § | |
| MARTINEZ-GONZALEZ, § | |
| § | |
| Defendant. § | |

### ORDER

On this day, the Court considered Defendant's Motion to Suppress and Dismiss ("Motion"), ECF No. 18. For the following reasons, the Motion is **DENIED**.

### I.  BACKGROUND

In support of his Motion, Defendant Yohangel Javier Martinez-Gonzalez generally relies on the facts alleged in the Complaint, ECF No.1, the Report of Investigation, and Border Patrol Agent Matthew Miller's testimony at the Preliminary Hearing. *See* Mot. 1. But, while he does not provide any of his own evidence, Martinez-Gonzalez characterizes some of the events preceding his arrest differently. For purposes of deciding this Motion, the Court relies on the facts as stated in the Complaint, except where Defendant presents them differently, in which case the Court accepts Defendant's presentation as true.

On June 6, 2024, Border Patrol Agents with the Ysleta Border Patrol Station received intelligence on an "alien stash house" in the 1100 block of Perlette Street in Socorro, Texas. Compl. 1. Two Agents, Silva and Rodriguez,[1] Resp. 2, ECF No. 22, posed as an illegal alien

---

[1] The names of the Agents are not in the Complaint or Defendant's Motion. For the sake of readability, the Court references the Government's Response for the limited purpose of establishing the Agents' names, which are not dispositive to the Court's analysis.

smuggler and an illegal alien, respectively, while other Agents "surround[ed]" the residence. Compl. 2; Mot. 1–2.

Silva and Rodriguez knocked on the building's front door, and Martinez-Gonzalez answered. Compl. 2. Posing as the smuggler, Silva asked if this was the "stash house". *Id.* Martinez-Gonzalez confirmed that it was but said that he did not recognize Silva. *Id.* After calling someone on the phone, Martinez-Gonzalez agreed to let Rodriguez, posing as the alien, into the house. *Id.* What happened next is unclear. Martinez-Gonzalez appears to claim that Rodriguez entered the residence before the Agents revealed their true identities. Mot. 2 ("The Agents then entered the house, identified themselves as Border Patrol Agents, and took Mr. Martinez Gonzalez into custody."). But the Government appears to claim that once Martinez-Gonzalez agreed to let Rodriguez in, the Agents told Martinez-Gonzalez who they really were before Rodriguez actually entered the building. Resp. 3.

In either instance, after learning who the Agents were, Martinez-Gonzalez tried to escape out of the residence's back window. Compl. 2. But he "saw other agents in the area and returned to the front of the house where agents asked for and were granted consent to enter and search the residence to further their immigration investigation." Compl. 2. Martinez-Gonzalez stepped outside, and the Agents entered the residence. *Id.*. Inside, they found seventeen people, all of whom they determined were illegal aliens. *Id.*

Martinez-Gonzalez was subsequently arrested and charged with Harboring Aliens and Conspiracy to Harbor Aliens. *See* Compl. 1; Indictment, ECF No. 11; *see also* 8 U.S.C. §§ 1324 (a)(1)(A)(iii), (a)(1)(A)(v)(1), and (a)(1)(B)(i), (ii). He now brings a Motion to Suppress and Dismiss, arguing that the agents' actions were coercive and reckless. *See generally* Mot. Specifically, he argues that he was deceived into consenting to the search, and that all physical

and testimonial evidence derived from the search must thus be suppressed. *Id.* at 3–5. He also argues that the agents' conduct was so outrageous that the Indictment should be dismissed in its entirety. *Id.* at 5–7. The Government responds that they obtained Martinez-Gonzalez's voluntary consent and that there was nothing impermissible about their behavior. *See generally* Resp.

## II.   ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Because the sanctity of one's home "stands at the very core of the Fourth Amendment," warrantless searches and seizures inside a home are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks and citations omitted). Such searches are therefore unconstitutional, "unless they fall into one of the few specifically established and well-defined exceptions to the general rule." *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

One such exception is consent. *Id.* (citing *Schneckloth*, 412 U.S. at 219). If the warrantless search of a home is conducted with voluntary consent, there is no Fourth Amendment violation. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citation omitted). At the motion to suppress stage, the government bears the burden of proving, by a preponderance of the evidence, that consent was given voluntarily. *Jenkins*, 46 F.3d at 451 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968)); *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999) (citation omitted).

Whether consent is voluntary "is a question of fact to be determined from the totality of all the circumstances." *Jenkins*, 46 F.3d at 451 (quoting *Schneckloth*, 412 U.S. at 227). Courts

3

consider six non-exhaustive factors especially relevant in making this determination: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.* (citing *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988)). No one factor is dispositive. *Id.*

### A. The Agents obtained Martinez-Gonzalez's voluntary consent to search the residence.

Martinez-Gonzalez argues that his consent was not given voluntarily because it was obtained through an unreasonable "knock-and-talk". Mot. 3. The Government responds that the knock-and-talk was reasonable, and that Martinez-Gonzalez freely consented to the search. Resp. 6–12.

A knock-and-talk is a permissible law-enforcement strategy, where officers approach a house to talk to the occupant, generally because they reasonably suspect criminal activity in the house and want to obtain the occupant's consent to search the premises. *See United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citations omitted). Officers must ensure that the encounter remains consensual and does not escalate into an otherwise impermissible investigatory stop. *See United States v. Fernandes*, 285 F. App'x 119, 123 (5th Cir. 2008). The line of demarcation is whether a "reasonable person would feel free to disregard the police and go about his business." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

Martinez-Gonzalez does not dispute that a reasonable knock-and-talk is constitutional. Mot. 3–4. But he argues that because the officers here initiated the interaction on false pretenses, a "reasonable person" would not have felt free to go about their business, and that the encounter was thus unconstitutional. *Id.* at 4.

But, as Martinez-Gonzalez acknowledges, a knock-and-talk may become an impermissible investigatory stop where an official "show of force" causes a reasonable person to believe that they are not free to disregard the police. *See* Mot. 3–4; *see also United States v. Trejo*, 492 F. Supp. 2d 659, 672 (W.D. Tex. 2007), *aff'd* 378 F. App'x 441 (5th Cir. 2010) (citations omitted). By contrast, a reasonable person would feel free to disregard the police if they did not even think that they were being questioned by police in the first place. *Cf. Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (holding that where "a suspect does not know that he is conversing with a government agent" there is no "danger of coercion").

And there is nothing per se impermissible about the agents going undercover to intentionally deceive, whether they identified themselves before entering the residence, as the Government suggests, or if Rodriguez entered first, as Martinez-Gonzalez appears to claim. *See, e.g.*, *Lewis v. United States*, 385 U.S. 206, 209–10 (1966) (upholding denial of motion to suppress where officer posing as customer purchasing illicit drugs was invited into defendant's home without a warrant); *United States v. Raines*, 536 F.2d 796, 800 (8th Cir. 1976) ("An officer may legitimately obtain an invitation into a house by misrepresenting his identity [and] [i]f he is invited inside, he does not need probable cause to enter, he does not need a warrant, and, quite obviously, he does not need to announce his authority and purpose." (citation omitted)); *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 289 & n.13 (S.D.N.Y. 2008) (collecting cases and noting that courts have "permitted officers to use a ruse to get a door opened where the officers promptly identified themselves as law enforcement before entering the premises." (citation omitted)).

If the officer is invited in under a false pretense, he may engage in "police activity" so long as he does not "exceed the scope of his invitation." *Raines*, 536 F.2d at 800 (citation

5

omitted). And once the officer reveals his identity, he can seek additional consent to expand the search. *See id.* at 801.

Even under Martinez-Gonzalez's version of the events, Rodriguez only entered the residence briefly before he and Silva told Martinez-Gonzalez that they were Border Patrol Agents. Mot. 2. He thus did not "exceed the scope of his invitation," which was to come in, before dropping the ruse and seeking consent to search as a law enforcement officer. *Id.*

In either instance, the "fundamental question" of whether Martinez-Gonzalez's consent was voluntary considering the totality of the circumstances "does not change simply because one of those 'circumstances' is the use of a deceptive tactic by law enforcement." *Montes-Reyes*, 547 F. Supp. 2d at 286.

And here, the majority of the relevant "voluntariness" factors weigh in the Government's favor. Martinez-Gonzalez was not in custody when he volunteered consent. Compl. 2. He cooperated with the police, allowing them inside, and later answered their questions. *See* Compl. 2. And there is no reason to doubt Martinez-Gonzalez's intelligence. *See, e.g.*, *United States v. Pickett*, No. 20-cr-435, 2021 WL 4067486, at *16 (N.D. Tex. Aug. 19, 2021) (finding that the "intelligence" factor favored a finding of consent where "[n]othing about [the defendant's] interactions with [the] Officer reflect[ed] any reason to believe that he is of below average intelligence and education." (citing *United States v. Staggers*, 961 F.3d 745, 759 (5th Cir. 2020))), *report and recommendation adopted*, 2021 WL 4060451 (Sept. 7, 2021).

Additionally, the Agents' actions were not unduly coercive. Martinez-Gonzalez does not allege that the officers used force, brandished any weapons, or made any threats to obtain his consent. *See generally* Mot.; *see also Untied States v. Outlaw*, 134 F. Supp. 2d 807, 819 (W.D. Tex. 2001), *aff'd* 319 F.3d 701 (5th Cir. 2003). To be sure, other officers "surround[ed]" the

building, Mot. 2, and Martinez-Gonzalez decided to stop trying to flee out a back window when he saw them, *see* Compl. 2.  The blocking of exits can sometimes be evidence of coercion.  *See United States v. Drayton*, 536 U.S. 194, 204 (2002).  But the Fifth Circuit has held that there was no coercion where several officers conducted a knock-and-talk while others went to the suspect's backyard to ensure that no one tried to escape out of a rear window.  *Trejo*, 378 F. App'x at 444–45.  And the officers did not chase Martinez-Gonzalez when he briefly fled.  Compl. 2–3.  Courts have found significantly more forceful procedures uncoercive, including in circumstances where officers used deceptive tactics to enter the residence.  *See, e.g.*, *Raines*, 536 F.2d at 798–801 (no coercion where officer tricked defendant into letting him in, revealed his identity—at which point up to four additional officers entered the house—and told defendant he would apply for a search warrant if consent was withheld).

The Government acknowledges that nothing suggests that Martinez-Gonzalez was apprised of his right to refuse consent.  Resp. 11.  But the agents were not necessarily required to advise him of this right.  *See United States v. Hernandez*, 279 F.3d 302, 308 (5th Cir. 2002) (citation omitted).  Finally, it is likely that Martinez-Gonzalez realized that the agents would find incriminating evidence—i.e., the aliens—in the residence.  But this factor alone is insufficient to find that his consent was involuntary.  *See, e.g.*, *United States v. Cota-Lopez*, 358 F. Supp. 2d 579, 596 (W.D. Tex. 2002), *aff'd*, 104 F. App'x 931 (5th Cir. 2004).

Because the majority of the factors weigh in the Government's favor, and considering the totality of the circumstances, the Court finds that Martinez-Gonzalez voluntarily consented to the warrantless search of the home.

**B.     The Government's conduct was not so outrageous that dismissal is warranted.**

Martinez-Gonzalez also argues that the Agents' conduct was so outrageous that the case against him should be dismissed.  Mot. 5–7.

While government misconduct can mandate dismissal in certain instances, the misconduct must be "'so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment.'"  *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (citation omitted).  Dismissal is thus warranted "only in 'the rarest circumstances.'"  *Id.* (citation omitted).  "Accordingly, a defendant claiming outrageous government conduct bears 'an extremely high burden of proof,' and must demonstrate, in light of the totality of the circumstances, both substantial government involvement in the offense and a passive role by the defendant."  *Id.*  (citation omitted).  Consequently, a defendant who actively participated in the charged crime cannot avail himself of this defense.  *Id.* (citation omitted).

Martinez-Gonzalez argues that by engaging in an undercover knock-and-talk instead of seeking a search warrant, the Agents engaged in outrageous conduct that put their own lives at risk.  *See* Mot. 5–7.  As support for this proposition, he cites to two state court cases.  Mot 6 (first citing *Garza v. State*, 632 N.W.2d 633, 639 (Minn. 2001); and then citing *State v. Sakellson*, 379 N.W.2d 779, 782 (N.D. 1985)).  But neither case found "outrageous conduct," nor did either case order dismissal of charges.  *Garza*, 632 N.W.2d at 639–40; *Sakellson*, 379 N.W.2d at 782, 785.

Further, as explained above, it is not illegitimate, nor outrageous, for agents to conceal their identities and deceive potential suspects.  Nor did Martinez-Gonzalez play a "passive" role in the offense.  The facts suggest, and he has not denied, that he was an active participant in the alleged criminal conduct.  *See United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) (holding that there can be no finding of "outrageous government conduct" where "defendant is

8

an active, willing participant in the criminal conduct that leads to his arrest . . . ." (citation omitted)).  Indeed, he was allegedly already harboring seventeen illegal aliens in the residence prior to letting Rodriguez in.  Compl. 2.  The Fifth Circuit has rejected an "outrageous conduct" defense where agents approached the defendant, offered to help him manufacture drugs, supplied him with the requisite expertise and equipment, and gave him a laboratory, holding that the defendant was still a "predisposed active participant."  *United States v. Tobias*, 662 F.2d 381, 383–87 (5th Cir. Unit B 1981).  The agents here did far less.  Dismissal is thus unwarranted.

### C.  Martinez-Gonzalez has not alleged a sufficient factual-conflict necessitating an evidentiary hearing.

Finally, Martinez-Gonzalez seeks an evidentiary hearing because he claims that there "are clear factual conflicts between the description of events" of the parties.  Mot. 7.

Evidentiary hearings are held only when a defendant alleges "sufficiently definite, specific, [and] detailed" facts, "which, if proven, would justify relief."  *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) (citation omitted).  The only suggestions of factual conflict in Martinez-Gonzalez's Motion are his statements that other Agents surrounded the building, and that Rodriguez entered the building before revealing his identity.  *See generally* Mot.; Compl.  But as explained above, even assuming the facts as Martinez-Gonzalez describes them, he is not entitled to relief.  The request for a hearing is thus denied.

### III.  CONCLUSION

Accordingly, Defendant's Motion to Suppress and Dismiss, ECF No. 18, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's request for an evidentiary hearing is **DENIED**.

**SO ORDERED.**

**SIGNED this 23rd day of September, 2024.**

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE