1              UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF TEXAS

3               U.S. MAGISTRATE JUDGE

4                 EL PASO DIVISION

5

6

7   UNITED STATES OF AMERICA  )No. EP:24-CR-1370

8   vs.                       )El Paso, Texas

9   YOHANGEL JAVIER           )
    MARTINEZ-GONZALEZ         )June 12, 2024
10  _____

11

12  ----------------------------------------------------------------

13                PRELIMINARY/DETENTION HEARING

14           Before the Honorable Miguel Torres

15             United States Magistrate Judge

16  ----------------------------------------------------------------

17

18

19

20

21

22

23

24     Proceedings reported by stenotype.  Transcript produced by

25  computer-aided transcription.

1                    A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:

4    UNITED STATES ATTORNEY'S OFFICE

5    BY:  MS. SHANE WAGMAN-ROMERO
     --------------------------------
6    Assistant United States Attorneys
     700 E. San Antonio, Suite 200
7    El Paso, Texas 79901

8

9

10   FOR DEFENDANT:

11   BY:  MR. DAMIAN RASMUSSEN
     -------------------------
12   4621 Pershing Drive
     El Paso, Texas 79903
13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The Court calls EP:24-M-2316, the United

2    States of America versus Yohangel Javier Martinez-Gonzalez.

3        Announcements, please.

4          MS. WAGMAN-ROMERO:  Shane Wagman-Romero on behalf of

5    the United States, ready.

6          MR. RASMUSSEN:  Good morning, Your Honor.  Damian

7    Rasmussen on behalf of Yohangel Javier Martinez-Gonzalez, ready

8    as well.

9          THE COURT:  Good morning.

10       We are proceeding on both, Mr. Rasmussen?

11         MR. RASMUSSEN:  Yes, Your Honor.

12         THE COURT:  Pursuant to the Due Process Protections

13   Act, the Government is put on notice as to its disclosure

14   obligations under the Supreme Court precedent of Brady versus

15   Maryland.

16       The failure to comply with those obligations on the part of

17   the Government could result in sanctions on the Government.  A

18   written notice to this effect will follow this hearing.

19       Go ahead and call your first witness, please.

20         MS. WAGMAN-ROMERO:  Thank you, Your Honor.  The

21   Government calls Matthew Miller.

22         THE COURT:  Do you swear to tell the truth, the whole

23   truth and nothing but the truth, so help you God?

24         AGENT MILLER:  I do, Your Honor.

25         THE COURT:  Have a seat.

1          You may proceed.

2               MS. WAGMAN-ROMERO:  Thank you, Your Honor.

3      Sir, would you please state your name for the record?

4               AGENT MILLER:  Matthew Miller.

5               MS. WAGMAN-ROMERO:  How are you employed?

6               AGENT MILLER:  United States Border Patrol agent.

7               MS. WAGMAN-ROMERO:  As a United States Border Patrol

8      agent, is it part of your duties to investigate allegations of

9      violations of Title 8, United States Code, 1324, Alien

10     Smuggling?

11              AGENT MILLER:  Yes, ma'am, it is.

12              MS. WAGMAN-ROMERO:  Are you aware of such an alleged

13     violation against an individual named Yohangel Javier

14     Martinez-Gonzalez?

15              AGENT MILLER:  Yes, ma'am.

16              MS. WAGMAN-ROMERO:  If you were to see Mr. Martinez,

17     would you be able to recognize him?

18              AGENT MILLER:  Yes, ma'am.

19              MS. WAGMAN-ROMERO:  Do you see him in the courtroom

20     today?

21              AGENT MILLER:  I do.

22              MS. WAGMAN-ROMERO:  Would you please describe him for

23     the record?

24              AGENT MILLER:  He is sitting next to Mr. Rasmussen at

25     Defense table No. 2.  He is wearing an orange jumpsuit with an

1   interpreter headset.

2           MS. WAGMAN-ROMERO:  May the record reflect the witness

3   identified the Defendant, Your Honor?

4           THE COURT:  The record will so reflect.

5           MS. WAGMAN-ROMERO:  Thank you.

6       Let me take this to the inception of the investigation

7   involving Mr. Martinez.

8       Did Border Patrol agents with the Ysleta Border Patrol

9   Station obtain information about a residence in Socorro, Texas?

10          AGENT MILLER:  Yes, ma'am, they did.  As a result of a

11  previous alien smuggling event.

12          MS. WAGMAN-ROMERO:  Is Socorro, Texas, in the Western

13  District of Texas?

14          AGENT MILLER:  Yes, ma'am, it is.

15          MS. WAGMAN-ROMERO:  Did agents go to the residence in

16  Socorro and conduct surveillance?

17          AGENT MILLER:  They did.

18          MS. WAGMAN-ROMERO:  What date did they do that?

19          AGENT MILLER:  I believe it was May [unintelligible]

20  of May 6, and they conducted surveillance on the same day as

21  the event, as this event.

22          MS. WAGMAN-ROMERO:  Would you need to look at the

23  criminal complaint to refresh your recollection to see what

24  date?

25          AGENT MILLER:  I don't know the specific dates of the

1  investigation.  It evolved.

2          MS. WAGMAN-ROMERO:  Your Honor, may I approach the

3  witness with the criminal complaint?

4          THE COURT:  You may.

5          AGENT MILLER:  Just to clarify, are you referring to

6  the investigation of the alien smuggling event we are here for

7  today or previous alien smuggling events and investigations on

8  the residence?  I am unclear.

9          MS. WAGMAN-ROMERO:  I see.  Sorry, thank you for

10  asking me to clarify.

11      My question was, did Border Patrol agents surveil the house

12  in Socorro, Texas, and, if so, on what date?

13          AGENT MILLER:  On the date of the event, June 6.

14          MS. WAGMAN-ROMERO:  Thank you.

15      On that date, did they notice anything at the house in

16  Socorro, Texas, which caught their attention?

17          AGENT MILLER:  They did.  They observed multiple

18  vehicles coming to the residence and multiple individuals

19  exiting those vehicles and entering the residence.

20          MS. WAGMAN-ROMERO:  As a result of their observations,

21  what did they decide to do?

22          AGENT MILLER:  They ran records checks on those

23  vehicles, and those vehicles did come back to -- tied to alien

24  smuggling events, as well as narcotics smuggling as well.

25          MS. WAGMAN-ROMERO:  Were any of these vehicles in the

1    name of the Defendant that you recall?

2            AGENT MILLER:  Rephrase the question, please.

3            MS. WAGMAN-ROMERO:  Were any of the vehicles in the

4    name of the Defendant?

5            AGENT MILLER:  No, ma'am.

6            MS. WAGMAN-ROMERO:  Did agents on that day ever

7    approach the residence?

8            AGENT MILLER:  They did.

9            MS. WAGMAN-ROMERO:  Can you tell the Court about the

10   facts surrounding that approach?

11           AGENT MILLER:  Agents decided to approach the

12   residence and pose as a delivery driver who was, in fact,

13   dropping off illegal aliens.

14           MS. WAGMAN-ROMERO:  They knocked on the door, correct?

15           AGENT MILLER:  Correct.

16           MS. WAGMAN-ROMERO:  Someone opened the door, correct?

17           AGENT MILLER:  No, ma'am.

18           MS. WAGMAN-ROMERO:  What happened?

19           AGENT MILLER:  The report states that they were

20   speaking with an individual, later identified as the Defendant,

21   through a metal screen door.

22           MS. WAGMAN-ROMERO:  They were speaking with an

23   individual, identified as the Defendant, through a metal screen

24   door.

25       What was that conversation like?

1          AGENT MILLER:  The agents still posing as a delivery

2    driver and an illegal alien asked the Defendant if -- they

3    actually stated and asked the Defendant if -- I got to remember

4    the exact conversation.

5        Your Honor, can I refer to my notes real quick?

6          THE COURT:  You may.

7          AGENT MILLER:  I don't want to misspeak.  They

8    informed the Defendant that they were there to drop off what is

9    known as a [unintelligible].  It is a term commonly used by

10   alien smuggling organizations to refer to illegal aliens.

11       The Defendant replied [unintelligible] what is the code.

12   This is another tactic used by alien smuggling organizations

13   when conducting transactions.  Sometimes over the phone they

14   require a code or a password to verify that they are, in fact,

15   conducting the illegal activities.

16       At that time, the Defendant said I don't know who you are,

17   and he got on his telephone to verify.  It appeared to the

18   agents he conducted a phone call to verify the validity of what

19   they were doing.

20          MS. WAGMAN-ROMERO:  At any point, did an agent ask the

21   Defendant if this was the stash house?

22          AGENT MILLER:  Yes, they did.  The agents did, in

23   fact, ask the Defendant if this was the stash house.  His reply

24   was yes, it is, and I don't know who you are.

25          MS. WAGMAN-ROMERO:  You mentioned that the Defendant

1  issued a phone call?

2       AGENT MILLER:  Yes, ma'am.

3       MS. WAGMAN-ROMERO:  What happened after that?

4       AGENT MILLER:  Agents at that time were still speaking

5  through the screen door and asking the Defendant if they could

6  drop off, if he can let the agents still posing as the illegal

7  aliens inside the house.  At that time, the Defendant agreed.

8  He said yes, that guy can stay, but I still don't know who you

9  are.

10     At that time, the agents believing that the Defendant was,

11 in fact, the caretaker of the residence, they proceeded to

12 identify themselves as Border Patrol agents and attempted to

13 effect an arrest, at which time the Defendant very hurriedly,

14 the report says hurriedly, walked away from the door and exited

15 out of their view towards the rear of the residence.  He

16 approached an open window and attempted to exit the open window

17 from the house.

18     There were other agents nearby in the area.  It appeared to

19 them he noticed they were there, and he decided to return to

20 the front of the house, at which time the agents then asked for

21 consent to enter and search the residence.

22      MS. WAGMAN-ROMERO:  Did they receive that consent?

23      AGENT MILLER:  They did.  The Defendant then stepped

24 outside the house, and agents entered and encountered a total

25 of 17 individuals that were determined to be illegal aliens.

1          MS. WAGMAN-ROMERO:  How were they determined to be

2     illegal aliens?

3          AGENT MILLER:  They questioned them as to their

4     citizenship, and I believe they were citizens of either

5     Guatemala and Mexico.

6          THE COURT:  Agent, do me a favor and back off a little

7     bit off the microphone.  Thank you.

8          AGENT MILLER:  Sorry, Your Honor.

9          THE COURT:  That's all right.

10          MS. WAGMAN-ROMERO:  Could you describe the house for

11     the Court?

12          AGENT MILLER:  When agents entered the residence, they

13     noted the house seemed very warm.  It smelled to them of heavy

14     body odor.  The living conditions to them did not appear to be

15     very hospitable.

16          MS. WAGMAN-ROMERO:  At this point, was Defendant

17     questioned as to his citizenship?

18          AGENT MILLER:  Yes.

19          MS. WAGMAN-ROMERO:  Was he determined to be a citizen

20     of Venezuela?

21          AGENT MILLER:  He was.

22          MS. WAGMAN-ROMERO:  Was he determined to be illegally

23     -- I will leave it at that.

24       Did agents find any [unintelligible] or phones inside the

25     residence?

1    AGENT MILLER:  Yes.  They saw a large number of cell

2    phones, and during the process of removing the illegal aliens

3    from the house, it is common practice to ask if they have any

4    property.  The illegal aliens began to identify those cell

5    phones as being their own.

6    MS. WAGMAN-ROMERO:  Can you describe how the cell

7    phones were [unintelligible] together or scattered throughout

8    the house?

9    AGENT MILLER:  Yes.  The agents said they located a

10   large number of cell phones together inside the living room,

11   and there were two other cell phones that were separate that

12   were [unintelligible] on top of a shoe box.

13   It may be noted that when the agents encountered the

14   Defendant, he was on his cell phone and exited out of the view

15   towards the rear of the house, and when he came back to the

16   front, he no longer had that cell phone with him.  They were

17   able to identify that with -- the report states they noticed

18   his particular cell phone he was using had a sticker on the

19   case, or on the phone.

20   MS. WAGMAN-ROMERO:  Did agents attempt to determine

21   who had ownership of that phone with the sticker?

22   AGENT MILLER:  I don't know.

23   MS. WAGMAN-ROMERO:  Well --

24   AGENT MILLER:  Go ahead.

25   MS. WAGMAN-ROMERO:  Did agents question any aliens

1   about their -- interview any aliens who claimed the phone?

2          AGENT MILLER: Yes, ma'am. Those two separate cell

3   phones, when they questioned again, the illegal aliens -- one

4   particular illegal alien identified one phone that was separate

5   from the large group of cell phones as being his own.

6          MS. WAGMAN-ROMERO: He was questioned by agents?

7          AGENT MILLER: Yes, ma'am.

8          MS. WAGMAN-ROMERO: [unintelligible]. Can you tell

9   the Court what this alien said, if anything, about the

10   Defendant here today?

11          AGENT MILLER: The illegal alien that claimed

12   ownership of the phone that was found with the Defendant's cell

13   phone stated that the smuggler asked him to use his cell phone.

14    When questioned by agents as to who was the smuggler he was

15   referring to, he said [unintelligible]. He pointed out the

16   Defendant.

17          MS. WAGMAN-ROMERO: Okay.

18          AGENT MILLER: Agents then asked and were granted

19   consent to search and view the illegal alien's cell phone.

20          MS. WAGMAN-ROMERO: I will get to that. I just want

21   to talk about statements he made about the Defendant.

22    Was he shown a six pack of the Defendant?

23          AGENT MILLER: He was, ma'am.

24          MS. WAGMAN-ROMERO: Did he identify the Defendant in

25   the six pack?

1          AGENT MILLER:  In subsequent investigation and post

2     Miranda with the illegal alien, he was, in fact, shown a six

3     pack of the Defendant's picture, and he did identify him as the

4     person in charge of the stash house.

5          MS. WAGMAN-ROMERO:  Did this alien say anything about

6     his interactions with the Defendant or instructions by the

7     Defendant while he was at the stash house?

8          AGENT MILLER:  Yes.  He indicated that the Defendant

9     had told everybody who was inside the room that he was being

10    held in that they were to stay there and not exit the room at

11    all.

12         MS. WAGMAN-ROMERO:  Were they told to stay quiet, as

13    well?

14         AGENT MILLER:  Yes, ma'am.

15         MS. WAGMAN-ROMERO:  He identified the Defendant as the

16    caretaker of the home; is that correct?

17         AGENT MILLER:  Correct.

18         MS. WAGMAN-ROMERO:  You mentioned a phone, this

19    alien's phone.

20       Did this alien give consent to search this phone?

21         AGENT MILLER:  At the time of arrest, yes, he did.

22         MS. WAGMAN-ROMERO:  Did agents view content inside

23    this phone?

24         AGENT MILLER:  They did.

25         MS. WAGMAN-ROMERO:  Can you describe any relevant

content for the Court?

AGENT MILLER:  Yes.  In reviewing the illegal alien's phone, the illegal alien indicated that A; it was the Defendant who asked him to use it, and when they searched [unintelligible] examination, they discovered messages from a contact with the name of El 007 or I think there was another message that stated [unintelligible] which the Defendant's middle name is Javier.  The illegal alien indicated those messages were initiated by the Defendant on his cell phone.

MS. WAGMAN-ROMERO:  Did those messages -- what were they about?

AGENT MILLER:  They were pertaining to alien smuggling.

MS. WAGMAN-ROMERO:  Were any other aliens at the stash house interviewed?

AGENT MILLER:  I don't know.

MS. WAGMAN-ROMERO:  I previously asked you about the state of the house.

It is correct there were no signs of mistreatment of the aliens; is that correct?

AGENT MILLER:  That is correct.

MS. WAGMAN-ROMERO:  I want to ask you very briefly about the Defendant's immigration status here.

Did you conduct records checks on the Defendant?

AGENT MILLER:  Yes, ma'am.

1       MS. WAGMAN-ROMERO:  And do those records checks reveal

2  that he is legally present or illegally present in the United

3  States?

4       AGENT MILLER:  He does not have any immigration status

5  to be in the United States.  He currently is under an asylum

6  proceeding, at which time I don't know the exact date of his

7  asylum hearing.

8       MS. WAGMAN-ROMERO:  He has a pending hearing?

9       AGENT MILLER:  Yes.

10      THE COURT:  What does that mean?  He is here illegally

11 or is not illegally?  When somebody comes across and they have

12 an asylum hearing, they don't have status, but they are legally

13 admitted into the United States or they are -- let me rephrase

14 that.

15    They are legally present in the United States?

16      AGENT MILLER:  When I searched his records, I could

17 not find how he was -- I think he applied -- sorry, he did

18 apply for asylum in the State of New York, and it was such a

19 recent time that the databases have not been updated.  I don't

20 know how those proceedings were [unintelligible].

21      THE COURT:  Do you know for a fact he has an asylum

22 date pending?

23      AGENT MILLER:  I do.  I don't know what the exact date

24 is.

25      THE COURT:  Does the fact he has an asylum date

1  pending give him the right to be present in the United States,

2  although it is a weird kind of legal limbo where it is not

3  status but he is here legally present because he has a pending

4  asylum date?

5          AGENT MILLER:  That is correct.  Immigration officials

6  have no legal right to detain him at the current level of his

7  asylum proceedings.

8          THE COURT:  Those remain pending?

9          AGENT MILLER:  Yes, sir.

10         THE COURT:  Sorry, go ahead.

11         MS. WAGMAN-ROMERO:  I did want to clarify.  I think

12  Your Honor did clarify that, and thank you.

13      If he were to be released, he would remain in the United

14  States, correct, or he would not be deported, I guess, is the

15  question, or do you know whether or not he would be able to

16  remain in the United States without being deported if he were

17  to be released?

18         AGENT MILLER:  Right now, the executive office of

19  immigration review is going to be notified of his criminal

20  proceedings in this particular case.  He would be -- if he

21  doesn't already have a date, a date would be set to try and get

22  him to see an immigration judge as quickly as possible to rule

23  on his asylum so that it runs ahead of the criminal

24  proceedings.

25         MS. WAGMAN-ROMERO:  I want to ask you a little bit

1    about his criminal history.

2        Does he have any criminal history?

3                AGENT MILLER:  He does.

4                MS. WAGMAN-ROMERO:  What is that criminal history?

5                AGENT MILLER:  I don't know the exact dates.  I

6    believe he has a larceny or theft charge and a felony evading

7    out of Hudspeth County, Texas, in March of this year.

8                MS. WAGMAN-ROMERO:  Would the evading arrest, is that

9    case still pending?

10               AGENT MILLER:  Yes, ma'am, it is.

11               MS. WAGMAN-ROMERO:  Are you aware of any facts of that

12   case or allegation of facts in that case?

13               MR. RASMUSSEN:  I'll object to that as to relevance.

14               THE COURT:  Overruled.  Go ahead.

15               AGENT MILLER:  I have viewed a Border Patrol report

16   concerning the facts of that case, yes.

17               MS. WAGMAN-ROMERO:  What are the alleged facts in that

18   case?

19               AGENT MILLER:  The report indicated that the Defendant

20   was with another individual who, at the end of the event, was

21   determined to be an illegal alien.  It was the Defendant and an

22   illegal alien.  They were inside a vehicle that rolled over

23   while fleeing from Border Patrol, and the Defendant and the

24   illegal alien absconded from the scene.  They were later found

25   in the desert, and the Defendant was charged with felony

1    evading by state authorities.

2           MS. WAGMAN-ROMERO:  Pass the witness, Your Honor.

3           THE COURT:  Mr. Rasmussen?

4           MR. RASMUSSEN:  Thank you, Judge.

5       Good morning, Agent.

6           AGENT MILLER:  Good morning, sir.

7           MR. RASMUSSEN:  You initially testified that an

8    investigation specifically referencing surveillance occurred on

9    May 6 at this residence?

10          AGENT MILLER:  Your Honor, can I verify that date?  I

11   believe I did testify to that.  I just don't remember.

12          THE COURT:  You okay with that?

13      Go ahead and check.

14          AGENT MILLER:  Thank you.

15          THE COURT:  The question is whether there was May 6

16   surveillance, in May?

17          AGENT MILLER:  Yes, Your Honor.

18          THE COURT:  This incident occurring on June 6,

19   correct?

20          AGENT MILLER:  Yes, Your Honor.

21          THE COURT:  Okay, thank you.

22          AGENT MILLER:  I have several reports.  May 9 is when

23   Border Patrol agents developed the address from a prior alien

24   smuggling scheme.  They developed information pertaining to

25   this address on numerous dates.  I am showing six or seven

1  different dates where they encountered individuals that had a
2  tie to this particular residence.

3          MR. RASMUSSEN:  Back to my question.

4      Is that the date they began conducting surveillance?

5          AGENT MILLER:  No, sir.  It is going to be June 6.

6          MR. RASMUSSEN:  They obtained the address on May 9 and
7  they did not ever -- it is your testimony today they didn't
8  surveil that until June 6, about a month later?

9          AGENT MILLER:  Correct.

10          MR. RASMUSSEN:  So we are clear, the address which is
11  in the complaint is 11161 [unintelligible] Street?

12          MS. WAGMAN-ROMERO:  Your Honor, I just hesitate to put
13  specific addresses on the record.  I know --

14          THE COURT:  It is in the complaint.

15          MS. WAGMAN-ROMERO:  This [unintelligible].

16          THE COURT:  I see what you are saying.

17          MS. WAGMAN-ROMERO:  Just to preserve the record.

18          THE COURT:  Are you making an objection or --

19          MS. WAGMAN-ROMERO:  No.  I think it is relevant.  I
20  want to put on the record that typically we try to protect the
21  addresses.

22          THE COURT:  All right, thank you.

23      Go ahead.

24          MR. RASMUSSEN:  You can answer.

25          AGENT MILLER:  Can you repeat the question, sir?

1          MR. RASMUSSEN:  We will get into it.

2       11161 [unintelligible] Street in Socorro?

3          AGENT MILLER:  Yes, sir.

4          MR. RASMUSSEN:  Let's talk about that.

5     How would you describe the property?

6          AGENT MILLER:  I don't know.  I have never been there.

7          MR. RASMUSSEN:  You have [unintelligible]?

8          AGENT MILLER:  No, sir.

9          MR. RASMUSSEN:  [unintelligible] it is a large

10    property that has multiple residences?

11         AGENT MILLER:  No, sir.

12         MR. RASMUSSEN:  The agents didn't tell you that?

13         AGENT MILLER:  I did not speak with the agent.  One of

14    the reports I viewed, I think, listed an A, some sort of A

15    associated.  I didn't know what that meant.

16         MR. RASMUSSEN:  It is your testimony now that no

17    surveillance was conducted until June 6 is the specific date,

18    right?

19         AGENT MILLER:  Yes, sir.

20         MR. RASMUSSEN:  From May 6 when the address was

21    developed until June 6 -- sorry, May 9 until June 6, was there

22    any investigation regarding my client specifically, Mr.

23    Martinez?

24         AGENT MILLER:  No, sir.

25         MR. RASMUSSEN:  It is fair to say during that month

1  period he was not on the radar as a suspect in the alien

2  smuggling?

3          AGENT MILLER:  Correct.

4          MR. RASMUSSEN:  Obviously, other people were, right,

5  other individuals?

6          AGENT MILLER:  I would say the residence itself was

7  the main target.

8          MR. RASMUSSEN:  On June 6 when that property was

9  surveilled, the property sits quite far back from the street,

10  right?

11          AGENT MILLER:  I don't know.

12          MR. RASMUSSEN:  What is the surveillance referring?

13          AGENT MILLER:  The report says at the residence.

14          MR. RASMUSSEN:  They entered the residence to conduct

15  surveillance?

16          AGENT MILLER:  I don't know.

17          MR. RASMUSSEN:  You testified on direct examination

18  that they observed multiple individuals going into the

19  property?

20          AGENT MILLER:  Yes, sir.

21          MR. RASMUSSEN:  What were the times of those?

22          AGENT MILLER:  Approximately 6:30 in the morning.

23          MR. RASMUSSEN:  How many different individuals were

24  seen going in?

25          AGENT MILLER:  One report stated a vehicle dropped off

or the agents observed four people exiting a vehicle and
entering the residence.

MR. RASMUSSEN:  That was the only time?

AGENT MILLER:  On that day?

MR. RASMUSSEN:  Correct, on the day the surveillance
was being conducted.

AGENT MILLER:  I would have to check the report.
There is a lot of dates and a lot of information.  I am not
real clear on the chronological order of when vehicles were
spotted going in and out.

MR. RASMUSSEN:  [unintelligible] I want to be clear.
It was just one vehicle going in and four individuals getting
out?

AGENT MILLER:  I need to refer to the report again.

MR. RASMUSSEN:  Judge, is that okay?

THE COURT:  Go ahead.

AGENT MILLER:  No, sir, there was a second vehicle, as
well.

MR. RASMUSSEN:  What was the second vehicle?

AGENT MILLER:  Small gray sedan.

MR. RASMUSSEN:  How many people were in the second
vehicle?

AGENT MILLER:  The report doesn't indicate.  It
doesn't say specific.

MR. RASMUSSEN:  Does it indicate people got out of the

1 vehicle and went into the residence?

2          AGENT MILLER:  No.  The report states that the people

3 just exited the other vehicle, which was a Jeep.

4          MR. RASMUSSEN:  The two vehicles arrived at the same

5 time?

6          AGENT MILLER:  Yes.

7          MR. RASMUSSEN:  It was one incident where two vehicles

8 pull into this property, correct?

9          AGENT MILLER:  Yes.

10          MR. RASMUSSEN:  Were any of those individuals

11 identified as my client of getting out of the vehicle?

12          AGENT MILLER:  No.

13          MR. RASMUSSEN:  Does anything about these individuals

14 indicate they were potentially illegal aliens or undocumented

15 aliens?

16          AGENT MILLER:  Yes.

17          MR. RASMUSSEN:  What is that?

18          AGENT MILLER:  At the time, the agents claimed that

19 they observed four individuals all wearing dark or black

20 clothing, which is commonly used.

21          MR. RASMUSSEN:  Commonly used as what?

22          AGENT MILLER:  When an illegal alien makes an illegal

23 entry, especially at nighttime, they are more often than not

24 wearing dark clothing.

25          MR. RASMUSSEN:  Of course, you will agree there is

1  innocent explanations for wearing dark clothing?

2          AGENT MILLER:  I do.

3          MR. RASMUSSEN:  You wear dark clothing?

4          AGENT MILLER:  I do.

5          MR. RASMUSSEN:  Are you wearing dark clothing?

6          AGENT MILLER:  Yes, sir.

7          MR. RASMUSSEN:  Am I wearing dark clothing?

8          AGENT MILLER:  Correct.

9          MR. RASMUSSEN:  Anything suspicious about our outfits?

10          AGENT MILLER:  No.

11          MR. RASMUSSEN:  These individuals wearing dark

12  clothing, were they muddy?

13          AGENT MILLER:  The report doesn't say.

14          MR. RASMUSSEN:  Were they wet?

15          AGENT MILLER:  It doesn't say that.

16          MR. RASMUSSEN:  Did they have luggage?

17          AGENT MILLER:  No.

18          MR. RASMUSSEN:  Again, you are not able to testify

19  where this surveillance was occurring, right?

20          AGENT MILLER:  Of the position?

21          MR. RASMUSSEN:  Yes.

22          AGENT MILLER:  No, I don't.

23          MR. RASMUSSEN:  I don't mean [unintelligible]?

24          AGENT MILLER:  During the surveillance?

25          MR. RASMUSSEN:  Yes.

1          AGENT MILLER:  I don't know.

2          MR. RASMUSSEN:  Approximately how long did those

3    vehicles stay at the property?

4          AGENT MILLER:  I don't know.  The record doesn't

5    indicate.

6          MR. RASMUSSEN:  Did any of the individuals leave the

7    residence and get into the car?

8          AGENT MILLER:  It doesn't say.

9          MR. RASMUSSEN:  Eventually, those individuals left?

10         AGENT MILLER:  The report doesn't say that either.

11         MR. RASMUSSEN:  When they went in to do their own

12   inspection, were the vehicles still on the property?

13         MS. WAGMAN-ROMERO:  Objection.  Asked and answered.

14         THE COURT:  Overruled.

15         AGENT MILLER:  I don't know.

16         MR. RASMUSSEN:  How long after the vehicles entered

17   the property did the agents approach the residence?

18         AGENT MILLER:  The agents initiated their

19   investigation at approximately 10:15 in the morning.

20         MR. RASMUSSEN:  Was it during business hours?

21         AGENT MILLER:  Yes, sir.

22         MR. RASMUSSEN:  6:30 in the morning is probably not

23   business hours, right?

24         AGENT MILLER:  It is subjective.  I could agree to

25   that, yes.

1          MR. RASMUSSEN:  You testified on direct examination

2   that there was a -- they posed as a delivery driver, right?

3          AGENT MILLER:  Yes, sir.

4          MR. RASMUSSEN:  You testified they used the word

5   "caja," right?

6          AGENT MILLER:  Yes.

7          MR. RASMUSSEN:  Caja, in English, means what?

8          AGENT MILLER:  Box.

9          MR. RASMUSSEN:  They were delivery drivers that had

10  boxes, right?

11          AGENT MILLER:  Correct.

12          MR. RASMUSSEN:  Is it fair to say that my client was

13  not understanding what these individuals were referencing?

14          AGENT MILLER:  Say the question again.

15          MR. RASMUSSEN:  My client said he doesn't know who you

16  are, right?

17          AGENT MILLER:  Yes.

18          MR. RASMUSSEN:  And how many individuals were at the

19  front door?

20          AGENT MILLER:  The report says there were two agents

21  posing outside the door and that's it.

22          MR. RASMUSSEN:  That would be one person posing as an

23  illegal, right?

24          AGENT MILLER:  Correct.

25          MR. RASMUSSEN:  Did that person identify himself as an

1   illegal alien?

2           AGENT MILLER:  The other agent posing as a driver did

3   the speaking, and he, in fact, informed the Defendant he was

4   there to drop off.

5           MR. RASMUSSEN:  This was conducted in Spanish, at

6   least when you are referencing the word "caja?"

7           AGENT MILLER:  Correct.

8           MR. RASMUSSEN:  Was the entire conversation in

9   Spanish?

10          AGENT MILLER:  Yes, sir.

11          MR. RASMUSSEN:  They had indicated that

12  [unintelligible] right, the word [unintelligible]?

13          AGENT MILLER:  They were asked by the Defendant, in

14  Spanish, who sent you and what is the code.

15          MR. RASMUSSEN:  That's when my client said I don't

16  know who you are, right?

17          AGENT MILLER:  No.  The agents replied a person sent

18  them.

19          MR. RASMUSSEN:  Okay.

20          AGENT MILLER:  And stated they had -- one for delivery

21  or they were dropping off one.

22          MR. RASMUSSEN:  Who was the person?

23          AGENT MILLER:  I don't know if it is fictitious or

24  not.  I haven't spoken to the agents.  They are indicated in

25  the report it was a name spelled [unintelligible].

1          MR. RASMUSSEN:  You know what that means in English?

2          AGENT MILLER:  Right.

3          MR. RASMUSSEN:  For the record, what does it mean?

4          AGENT MILLER:  White.

5          MR. RASMUSSEN:  The word "stash house" was also used,

6     right?

7          AGENT MILLER:  Yes, sir.

8          MR. RASMUSSEN:  What was the word in Spanish?

9          AGENT MILLER:  Estancia.

10          MR. RASMUSSEN:  It means the same in English; is that

11    fair to say?

12          AGENT MILLER:  Yes.

13          MR. RASMUSSEN:  The delivery driver was to have boxes,

14    and they were going to put them in the stash place.

15       That would all make sense, right?

16          AGENT MILLER:  Yes, it could.

17          MR. RASMUSSEN:  Just like [unintelligible] clearly

18    could make sense?

19          AGENT MILLER:  Correct.

20          MR. RASMUSSEN:  At that point, nonetheless, my client

21    said they could enter the residence, right?

22          AGENT MILLER:  Sorry, say that again.

23          MR. RASMUSSEN:  At that point, my client allowed them

24    to enter the residence, right?

25          AGENT MILLER:  No.  He turned around to verify.  He

1  actually initiated a phone call on his cell phone to verify if

2  they were being truthful, I think, or verify why they were

3  there.

4          MR. RASMUSSEN:  Did the agents hear any of that phone

5  call?

6          AGENT MILLER:  The report does not say.

7          MR. RASMUSSEN:  After that phone call, my client

8  agreed to allow the agents inside the house?

9          AGENT MILLER:  No.  The agents asked them hey, can I

10 drop this guy off, and, while still on the phone, he said I

11 don't know who you are, but the other agent, posing as an

12 illegal alien, he can stay.

13         MR. RASMUSSEN:  Did that agent posing go inside the

14 house?

15         AGENT MILLER:  No.

16         MR. RASMUSSEN:  Your complaint states the Defendant

17 agreed to let the other agent inside the house, who was still

18 posing as an illegal alien?

19         AGENT MILLER:  He did.

20         MR. RASMUSSEN:  They are still outside?

21         AGENT MILLER:  Yes, sir.

22         MR. RASMUSSEN:  At that time, the agents identified

23 themselves as Border Patrol, right?

24         AGENT MILLER:  Yes, sir.

25         MR. RASMUSSEN:  That's when you indicated in your

1  direct examination that they attempted to effectuate an arrest?

2  　　　　AGENT MILLER:  Or they attempted to conduct further

3  investigation.  I misspoke.

4  　　　　MR. RASMUSSEN:  But that's what they were doing,

5  right?

6  　　　　AGENT MILLER:  Yes.

7  　　　　MR. RASMUSSEN:  What changed?

8  　　　　AGENT MILLER:  Sorry?

9  　　　　MR. RASMUSSEN:  What changed?

10  　　　　AGENT MILLER:  Concerning which parts?

11  　　　　MR. RASMUSSEN:  How did they effect the arrest?

12  　　　　AGENT MILLER:  When the Defendant realized they were

13  Border Patrol agents, he attempted to flee the house.

14  　　　　MR. RASMUSSEN:  The agents were inside the house?

15  　　　　AGENT MILLER:  No, sir.

16  　　　　MR. RASMUSSEN:  How did he flee if they couldn't get

17  inside the house?

18  　　　　AGENT MILLER:  They could see through the door.

19  　　　　MR. RASMUSSEN:  The door was locked?

20  　　　　AGENT MILLER:  I don't know.

21  　　　　MR. RASMUSSEN:  It is your testimony right now they

22  could not go inside the house?

23  　　　　AGENT MILLER:  Correct.

24  　　　　MR. RASMUSSEN:  Were they wearing body cams?

25  　　　　AGENT MILLER:  I don't know.

1        MR. RASMUSSEN:  Did you ask them?

2        AGENT MILLER:  I have not yet.

3        MR. RASMUSSEN:  The policy requires them to wear

4 those, right?

5        AGENT MILLER:  No.

6        MR. RASMUSSEN:  They have them, and it is at their

7 discretion?

8        AGENT MILLER:  Every agent has a body cam.

9        MS. WAGMAN-ROMERO:  Objection to the extent we are

10 asking --

11        MR. RASMUSSEN:  [unintelligible].

12        MS. WAGMAN-ROMERO:  -- on the policy.

13        THE COURT:  Sustained.

14        MR. RASMUSSEN:  You already stated two individuals at

15 the front door.

16    Where were the other agents around the house?

17        AGENT MILLER:  The report indicates there were other

18 agents near the open window towards the rear of the house.

19        MR. RASMUSSEN:  How many?

20        AGENT MILLER:  Two, I believe.

21        MR. RASMUSSEN:  Then, my client crawled through a

22 window?

23        AGENT MILLER:  Yes.  The agents did say that.

24        MR. RASMUSSEN:  Did he get outside?

25        AGENT MILLER:  No.

1          MR. RASMUSSEN:  He crawled through the window and

2     crawled back in?

3          AGENT MILLER:  The report says he attempted to exit

4     the window, and he went back inside.

5          MR. RASMUSSEN:  That's when you went to the front

6     door?

7          AGENT MILLER:  Yes, sir.

8          MR. RASMUSSEN:  The agents asked at that point if they

9     could enter the residence?

10          AGENT MILLER:  Yes.

11          MR. RASMUSSEN:  He could have told them no?

12          AGENT MILLER:  Yes.

13          MR. RASMUSSEN:  You indicated in your report the

14     temperature was 105 degrees that day?

15          AGENT MILLER:  That's what the report says, yes, sir.

16          MR. RASMUSSEN:  Do you have any recollection of the

17     temperature that day?

18          AGENT MILLER:  The report states it was over 100, I

19     think.

20          MR. RASMUSSEN:  There were other individuals inside

21     the house, right?

22          AGENT MILLER:  Yes, sir.

23          MR. RASMUSSEN:  When the agents were at the front

24     door, did they see any other individuals?

25          AGENT MILLER:  The front door, no.

1          MR. RASMUSSEN:  When they were at the back window, did

2     they see any other individuals?

3          AGENT MILLER:  Yes, sir.  They could see through

4     another window.

5          MR. RASMUSSEN:  How many windows are they looking in?

6          AGENT MILLER:  I don't know.

7          MR. RASMUSSEN:  Let's go to the other window.

8        What could they see through the other window?

9          MS. WAGMAN-ROMERO:  Objection, Your Honor, to the

10    extent this is all the same testimony that only goes to a

11    motion to suppress and not to the relevancy of the case, the

12    testimony he consented and they entered.

13         MR. RASMUSSEN:  I'm back to before the consent, Your

14    Honor.

15         THE COURT:  Look, I am going to overrule the

16    objection.  It is relevant.  What the agents observed was

17    relevant.  The fact it was a different agent at a different

18    window is still relevant to what was observed and which the

19    Agent has testified to on direct.  It is overruled.

20         MR. RASMUSSEN:  Let's talk about the other window.

21         AGENT MILLER:  Okay.

22         MR. RASMUSSEN:  What did the agents observe through

23    the other window?

24         AGENT MILLER:  The report states the agent observed a

25    female who appeared to them to be in distress.

1          MR. RASMUSSEN:  Where was that female?

2          AGENT MILLER:  The report states that she was on an

3    inflatable mattress.

4          MR. RASMUSSEN:  Where?

5          AGENT MILLER:  I don't know the exact position.

6          MR. RASMUSSEN:  In a bedroom, the kitchen, the

7    bathroom?

8          AGENT MILLER:  I don't know.

9          MR. RASMUSSEN:  Agents were looking through two

10   windows.

11      Were they looking through any others?

12         AGENT MILLER:  The report does not say any other.

13         MR. RASMUSSEN:  This was before they had gone into the

14   house?

15         AGENT MILLER:  Yes, sir.

16         MR. RASMUSSEN:  The subsequent investigation revealed

17   cell phones, right?

18         AGENT MILLER:  Correct.

19         MR. RASMUSSEN:  It is your testimony there was a pile

20   of cell phones together?

21         AGENT MILLER:  The report states that several cell

22   phones were located together.  It doesn't say a pile.

23         MR. RASMUSSEN:  How many?

24         AGENT MILLER:  Unknown.

25         MR. RASMUSSEN:  There were a number of them, but you

1    don't know how many more than one?

2           AGENT MILLER: I don't.

3           MR. RASMUSSEN: There was another location where two

4    other cell phones were located?

5           AGENT MILLER: Correct.

6           MR. RASMUSSEN: You know it was just two other phones?

7           AGENT MILLER: Yes, sir.

8           MR. RASMUSSEN: They interviewed at least one of the

9    other aliens inside of that residence, right?

10          AGENT MILLER: Yes, sir.

11          MR. RASMUSSEN: In that alien's phone was

12   conversations of alien smuggling?

13          AGENT MILLER: Yes, sir.

14          MR. RASMUSSEN: Other than a potential coincidence

15   there was the name of Javier Chavez with my client's middle

16   name, was there anything else in reference to my client being

17   on that phone?

18          AGENT MILLER: Yes.

19          MR. RASMUSSEN: What was that?

20          AGENT MILLER: El 007.

21          MR. RASMUSSEN: What does that mean?

22          AGENT MILLER: The illegal alien identified the

23   Defendant as the person that used that moniker.

24          MR. RASMUSSEN: Other than the Defendant saying he

25   used my phone, was there any evidence inside of the phone

1    actually related to my client?

2        AGENT MILLER:  The report indicates that the messages

3    referred to the sender on the phone as El 007.

4        MR. RASMUSSEN:  Right.  You don't know what El 007

5    means?

6        AGENT MILLER:  No, sir.

7        MR. RASMUSSEN:  You are just saying this other

8    individual -- who was there illegally, right?

9        AGENT MILLER:  Yes, sir.

10        MR. RASMUSSEN:  Who was breaking the law, right?

11        AGENT MILLER:  Yes, sir.

12        MR. RASMUSSEN:  Said somebody else used my phone,

13    right?

14        AGENT MILLER:  Yes, sir.

15        MR. RASMUSSEN:  But there is nothing else to

16    corroborate that, right?

17        AGENT MILLER:  Subsequent other investigation, yes.

18        MR. RASMUSSEN:  What?

19        AGENT MILLER:  Other than his admission, his

20    statements, his written words?

21        MR. RASMUSSEN:  Yes.

22        AGENT MILLER:  Yes.

23        MR. RASMUSSEN:  [Unintelligible]?

24        AGENT MILLER:  Nothing other than that.

25        MR. RASMUSSEN:  Nothing other than him saying that?

1          AGENT MILLER:  Correct.

2          MR. RASMUSSEN:  Would you agree with me someone here

3  illegally has every incentive not to get in any more trouble,

4  right?

5          AGENT MILLER:  Yes.

6          MR. RASMUSSEN:  Would you agree with me it is rather

7  suspicious there is this conversations on this other illegal's

8  phone, and he is saying it wasn't me, it was somebody else,

9  right?

10         AGENT MILLER:  I'm unclear on that question.

11         MR. RASMUSSEN:  You testified that my client used a

12  cell phone, right?

13         AGENT MILLER:  Correct.

14         MR. RASMUSSEN:  It is not the same cell phone we are

15  talking about, right?

16         AGENT MILLER:  It is the illegal alien's cell phone.

17         MR. RASMUSSEN:  Somebody [unintelligible] sticker?

18         AGENT MILLER:  It was the cell phone the agents had

19  observed him at the front door, the phone he was using.

20         MR. RASMUSSEN:  My client had access to a cell phone?

21         AGENT MILLER:  Yes.

22         MR. RASMUSSEN:  At least he was using the phone or

23  pretending to use the phone?

24         AGENT MILLER:  Correct.

25         MR. RASMUSSEN:  They saw him with the phone, right?

1    It wasn't the phone that this evidence is in, right?

2            AGENT MILLER:  The agents saw?

3            MR. RASMUSSEN:  Yeah.

4            AGENT MILLER:  No, it was not.

5            MR. RASMUSSEN:  The only evidence related to alien

6    smuggling is in that phone that was [unintelligible]?

7            AGENT MILLER:  Correct.

8            MR. RASMUSSEN:  There is nothing in these other phones

9    that my client had that he was actually using that the agent

10   saw him using that was related to alien smuggling, right?

11           AGENT MILLER:  Say that question again.

12           MR. RASMUSSEN:  You searched the two phones that you

13   found at least one of them my client was in possession of?

14           AGENT MILLER:  No.  We have not searched the cell

15   phone of the Defendant.

16           MR. RASMUSSEN:  At this time, it is fair to say there

17   is nothing inside the phone that is related to alien smuggling?

18           AGENT MILLER:  Inside the Defendant's phone?

19           MR. RASMUSSEN:  Correct.

20           AGENT MILLER:  Yes, that is correct.

21           MR. RASMUSSEN:  The other case that you referenced was

22   the evading arrest.

23       My client was arrested, right?

24           AGENT MILLER:  Yes, sir.

25           MR. RASMUSSEN:  He went to court and was released on

1   bond, right?

2        AGENT MILLER:  I think so.  I don't know for sure.

3        MR. RASMUSSEN:  He is not in custody?

4        AGENT MILLER:  He is not in custody, so I assume yes.

5        MR. RASMUSSEN:  To your knowledge, there is no open

6   warrant for that case, right?

7        AGENT MILLER:  No, not to my knowledge.

8        MR. RASMUSSEN:  He hasn't missed any court dates for

9   that?

10       AGENT MILLER:  Not to my knowledge, no.

11       MR. RASMUSSEN:  Other than that one illegal alien

12  stating my client was the coyote and having alien smuggling

13  conversations in his own phone, do you have any other evidence

14  that my client was related to this alien smuggling scheme?

15       AGENT MILLER:  The illegal alien [unintelligible] find

16  the Defendant in a photographic lineup and stating in a post

17  Miranda statement that the Defendant was, in fact, the

18  caretaker of the house.  No, I didn't have anything else.

19       MR. RASMUSSEN:  So, he is the only person

20  [unintelligible]?

21       AGENT MILLER:  Not me personally.  The agents ID'd

22  him.

23       MR. RASMUSSEN:  [unintelligible]?

24       AGENT MILLER:  I don't know.

25       MR. RASMUSSEN:  Thank you, Judge.  Pass the witness.

1          THE COURT:  Any other questions?

2          MS. WAGMAN-ROMERO:  A few follow-ups to clarify some

3    things, Your Honor.

4          THE COURT:  Sure.

5          MS. WAGMAN-ROMERO:  Hello again, Agent.

6      Mr. Rasmussen asked you a number of questions about

7    delivery drivers and boxes.  I wanted to clarify some things

8    related to what he asked you.  In your complaint, it says he

9    posed as a delivery driver, and you also testified to that.

10         When you used the phrase "delivery driver," are you saying

11   he was wearing a UPS outfit or FedEx outfit?  What do you mean

12   by delivery driver?

13         AGENT MILLER:  In the literal sense, he was delivering

14   something.  In this case, it would have been an illegal alien.

15         MS. WAGMAN-ROMERO:  When he approached and discussed a

16   caja that Mr. Rasmussen asked you about, did he, in fact, have

17   a box with him in the sort that Amazon would deliver or

18   something to that effect?

19         AGENT MILLER:  Not to my knowledge, no.

20         MS. WAGMAN-ROMERO:  When he approached, he had another

21   undercover agent with him?

22         AGENT MILLER:  Yes, ma'am.

23         MS. WAGMAN-ROMERO:  No objects to be delivered,

24   correct?

25         AGENT MILLER:  Not to my knowledge, no.

1        MS. WAGMAN-ROMERO:  The alien who was questioned about

2   the phone, if you know it, do you know where he was located

3   inside the house?

4        AGENT MILLER:  Specific location, I don't know.

5        MS. WAGMAN-ROMERO:  Do you know whether or not that

6   individual was found in close proximity with other aliens found

7   inside the house?

8        AGENT MILLER:  Yes, ma'am.  He claimed he was with the

9   other males inside the house.

10        MS. WAGMAN-ROMERO:  In a room?

11        AGENT MILLER:  Yes, ma'am.

12        MS. WAGMAN-ROMERO:  Mr. Rasmussen asked you, and I

13   know he was going through it very quickly.  At least what I

14   heard, nothing inside the Defendant's phone.

15     At this point, is it fair to say there was nothing inside

16   the Defendant's phone that relates to alien smuggling?  Law

17   enforcement has not looked in that phone yet, correct?

18        AGENT MILLER:  That is correct.

19        MS. WAGMAN-ROMERO:  You don't know?

20        AGENT MILLER:  We do not know.

21        MS. WAGMAN-ROMERO:  Mr. Rasmussen also asked you

22   whether or not the Defendant had missed any court dates in his

23   immigration case.

24     You replied not to my knowledge; is that correct?

25        AGENT MILLER:  Correct.

1          MS. WAGMAN-ROMERO:  Do you know whether or not there

2  have been any court dates in that case?

3          AGENT MILLER:  No, I don't.

4          MS. WAGMAN-ROMERO:  May I have a moment, Your Honor?

5          THE COURT:  You may.

6          MS. WAGMAN-ROMERO:  That's all, Your Honor.  Thank

7  you.

8          MR. RASMUSSEN:  No further questions.

9          THE COURT:  Before you step down, a couple of very

10  quick questions that relate to the detention issue.

11    First, in the paperwork you have reviewed with respect to

12  his asylum claim, not the asylum claim but the fact of an

13  asylum hearing date he has pending, in your review of that

14  paperwork, do you know when the Defendant entered the United

15  States, when and where?

16          AGENT MILLER:  I don't remember.

17          THE COURT:  The other question I have relates to

18  something that you testified to on cross-examination by Mr.

19  Rasmussen.

20    You indicated that one of the agents that was looking

21  through the window saw a woman in distress; is that correct?

22          AGENT MILLER:  The agents claimed she appeared to them

23  to be in distress.

24          THE COURT:  My only question is, did this individual

25  require any medical attention afterwards that you are aware of?

1            AGENT MILLER:  I don't know.

2            THE COURT:  You don't know whether an ambulance was

3     sent to the scene or anything like that?

4            AGENT MILLER:  No, sir, I don't.

5            THE COURT:  Very well.

6       Anything else, Counsel?

7            MR. RASMUSSEN:  No, Your Honor.

8            MS. WAGMAN-ROMERO:  No, Your Honor.

9            THE COURT:  You can step down, sir.

10      Any other witnesses or evidence?

11           MS. WAGMAN-ROMERO:  No other witnesses, Your Honor.

12     We ask you take judicial notice of the Pretrial Services

13     report.

14           THE COURT:  Very well.

15      Any witnesses or evidence?

16           MR. RASMUSSEN:  No, Your Honor.

17           THE COURT:  Let me hear your argument briefly, please.

18           MS. WAGMAN-ROMERO:  Absolutely, Your Honor.

19      Your Honor, I will address probable cause first.  You have

20     heard testimony that, first, the Defendant in the courtroom is

21     the Defendant in the criminal complaint and that the alleged

22     crime took place in the Western District of Texas.

23      Mr. Martinez is charged with a Conspiracy to Harbor Aliens.

24     You have heard testimony that 17 aliens, who were confirmed to

25     be illegally present in the United States, were found in the

house where Mr. Martinez was also found.  There are aliens
involved in this offense.

In terms of harboring, you have heard testimony, and we
think this part is particularly important here, that when
agents approached the door, it was Mr. Martinez who was the
person who, I guess, maybe not opened the door because it was
the screen thing, I assume there was some door, who was at the
door.

They spoke to Mr. Martinez about a caja.  They did not have
an actual box.  They had a person with them.  They spoke to him
about dropping off and that the Defendant asked what is the
code.  The Defendant allowed, or by his oral indications,
allowed the illegal alien or the undercover Border Patrol agent
to stay.  When the agents revealed themselves to be Border
Patrol agents, he attempted to flee.

That is all circumstantial evidence he is in charge of this
house, and he is the person approaching the door, he is
fleeing, he is making a phone call to see who these people are
at the door, he is the one who is [unintelligible] on the power
here.

THE COURT:  Get to the part of the evidence or give me
your view of the evidence that shows that he had an agreement
with some unknown persons to conceal, harbor and shield from
detection.

What is the agreement part?

1          MS. WAGMAN-ROMERO:  I guess [unintelligible]

2    intertwined.

3          THE COURT:  Sure.

4          MS. WAGMAN-ROMERO:  There is the alien the agents

5    spoke with and he -- sorry, Your Honor, I am trying to think

6    how to parse that out.

7          For one, he had the phone call to verify with someone else.

8    That's another person that is a conspiracy, who these people

9    were at his door.  That's an indication there were others

10   involved in this conspiracy.

11         The surveillance shots showed individuals being dropped

12   off.  You heard testimony that none of those cars were

13   registered in the Defendant's name.  That indicates there is

14   other people involved in this conspiracy.

15         You heard testimony that there was a phone that one of the

16   illegal aliens staying at the house said that the Defendant

17   used to have communications with other people about alien

18   smuggling.  That's an indication there were other people in

19   this conspiracy.

20         Beyond that, I assume that Mr. Rasmussen will argue that

21   maybe it was that illegal alien who was really the alien

22   smuggler who was really the owner of the stash house.

23         However, even if you assume, and we are not saying this is

24   our argument, but assuming you take Mr. Rasmussen's assumed

25   argument, a lot of assuming, this other alien was the one

1    sending those alien smuggling messages, that's another person

2    too.  That also goes to the idea there is a conspiracy.

3        I know it was a little confusing, sorry.  That alien

4    referred to the Defendant as a coyote.  We believe all of that,

5    just the circumstances, shows that this Defendant is not the

6    only one bringing 17 aliens over here and holding them in the

7    stash house.  We believe that goes to the conspiracy with

8    another.

9        We also believe, substantively, he is harboring these

10   individuals.  You heard testimony that he told them to stay

11   quiet.  This other alien was found in the room in which

12   purportedly the Defendant told him to stay with the other

13   aliens.  The Defendant is the one answering the door, the

14   Defendant was the one asking for the code, the Defendant is the

15   one calling other people.

16       We believe that there is clear probable cause here that he

17   is in a conspiracy to harbor aliens, Your Honor.

18            THE COURT:  Let me ask you this, this is really

19   neither here nor there.

20       Do you think that -- this has been charged as a conspiracy

21   to harbor.  Do you think these facts present a clear case of

22   the substantive offense?

23            MS. WAGMAN-ROMERO:  I would argue that there is

24   probable cause for the substantive offense.

25            THE COURT:  Which is not charged?

1          MS. WAGMAN-ROMERO:  I don't see that charge in the

2    complaint, Your Honor.

3          THE COURT:  But you have gone through what you think

4    is the evidence of the conspiracy, circumstantial evidence,

5    that points to an agreement between the Defendant and others

6    given that there is some evidence, in your opinion, of him

7    being in charge quote/unquote of this house, stash house.

8       There is some indicia of agreements with other people to

9    engage in that particular substantive criminal conduct, right?

10         MS. WAGMAN-ROMERO:  Correct, Your Honor.

11         THE COURT:  Thank you.

12         MS. WAGMAN-ROMERO:  Thank you.

13         THE COURT:  Mr. Rasmussen?

14         MR. RASMUSSEN:  Thank you, Judge.

15      The problem with the conspiracy is this.  The agent

16   testified that when they investigated this residence for over a

17   month, and during that time there was absolutely no evidence

18   that my client was part of any sort of conspiracy, that he was

19   part of this residence, he was part of any sort of alien

20   smuggling.  He said, during that time, my client's name and who

21   he was had never came up.

22         THE COURT:  By the way, I agree with you completely on

23   that.  Address the issues that point to the appearance of

24   collaboration with others with respect to the substantive

25   offenses that appear to have been alleged by the agents.

1      MR. RASMUSSEN:  Yes, Judge.

2    My client answered the door, or was at the door.  That

3  alone is not indicative of anything.  There is no evidence he

4  was on a lease agreement, and no evidence he was the owner of

5  the house, no evidence of anything.

6    As far as his relation to the house, I would say answering

7  the door is an innocent explanation.  Again, they are talking

8  about boxes.  Sure, we can jump to that meaning something

9  illegal.  That's the problem.  We can't assume here that my

10  client knew that they wanted to conduct an illegal transaction.

11  There is nothing that indicates my client was part of that, was

12  part of the conspiracy.

13    The only evidence, Judge, is another individual, who was

14  illegally in the United States, who on his own phone has

15  correspondence with [unintelligible].  It does not relate back

16  to my client.  There is no evidence that my client made any

17  confessions about this.  There is no evidence in my client's

18  phone that he was part of this conspiracy.

19    I think, Judge, based on the totality of the circumstances

20  at this point that there is just not probable cause that my

21  client was part of this conspiracy, and we ask for you to find

22  no probable cause, Judge.

23      THE COURT:  Thank you very much.

24    With respect to probable cause, the evidence is

25  circumstantial on the conspiracy part.  That's always -- you go

back to the criminal law 101 idea of what is a conspiracy, what
is the meeting of the minds.  The evidence is circumstantial
here and, only then, barely so.

There is enough under the probable cause standard, which is
low, for the Court to find there is some indicators he was
collaborating with others with respect to harboring
individuals.

I will note, which is just for what it is worth, it seems
to me this is -- had this case been charged as a concealing,
harboring and shielding from detection substantive case, it is
a much clearer easily met burden for the Government.

You know, that's not the Court's choice.  Of course, it is
within the purview solely of the Government, the executive
branch.  They still meet their burden.

Did the parties wish to address the issue of detention very
briefly?

MS. WAGMAN-ROMERO:  Yes, Your Honor.

We would like to [unintelligible] simply put, we do think
this individual is a flight risk.  We are not necessarily
saying he is going to flee to another country or be deported.

It came out he has a pending hearing.  He is here.  He is
from Venezuela.  He can also be removed to Mexico, but we do
think he has incentives and would fail to appear for court,
which is what the standard of the Bail Reform Act is.

He has a prior evading arrest where that charge is pending,

but there was another alien in the vehicle, and he rolled the

vehicle.  He was fleeing arrest there.  He also attempted to

flee here through a window in the residence.

In terms of other factors that relate to his impact of

danger to the community and [unintelligible] as well, he

continues to make very poor choices.  He has these two pending

charges, the larceny and evading arrest.

The Pretrial Services report indicates he has four active

warrants from the municipal court already, and, yet, he is

arrested again in these allegations.  We do not think he has

any incentives to appear in court.  He is the kind of person,

it seems to us, that makes quite poor choices about criminal

conduct and his engagement with the judicial system.

We respectfully ask you to detain him.

THE COURT:  Thank you.

Mr. Rasmussen?

MR. RASMUSSEN:  Judge, briefly.

We ask you consider releasing him.  We will not ask you to

consider releasing him to a location or residence.  We ask that

you consider releasing him to Dismas Charities.  It would give

you any sort of added comfort he will have to follow all their

rules and regulations.  Dismas does a great job of keeping

track of people and making sure they follow all their own rules

and regulations.

The Government is right, my client is not fleeing back to

1   Venezuela.  Quite the opposite, if he goes back there, he is

2   worried about his life.  That's why he is here applying for

3   asylum.  He has every incentive to stay in the United States

4   and every incentive to follow-up with the immigration stuff.

5   What is most important about what the Agent testified, not

6   counting probable cause, he says specifically, Judge, in a case

7   where an individual has an immigration hearing that they will

8   run the date ahead of the criminal proceedings.  This is why it

9   is important, Judge.  If you consider releasing him to Dismas

10  Charities, he can address the immigration hearing.  If he is

11  forced to stay in custody, he can't address it, and the two

12  will be tacked [unintelligible] each other forever.

13  I would ask that you consider releasing him at Dismas.  You

14  can give him any added conditions.  There is no indication he

15  missed any court hearings, and he wants to continue with those

16  court hearings because he doesn't want to screw up his chances

17  for the opportunity to remain in the United States.

18  Based on the lack of any criminal convictions, we know he

19  has been here at least eight months, we ask you put him on the

20  list for Dismas Charities, and taking into account by your own

21  ruling that although probable cause was found, you did state it

22  was not the strongest case.

23  If he is released out of custody, it gives us a better

24  opportunity, as Defense, to meet with him, prepare for this

25  case, conduct investigations and such.

1       More importantly, if he is released, he can proceed with

2   the immigration hearing.

3       Thank you.

4           THE COURT:  Thank you very much.

5       I will note that, I think, the case is United States versus

6   Jackson, a Fifth Circuit case from the 1980s, which does

7   mention strength of the case while a factor in a detention

8   hearing, without a doubt, it is not necessarily the strongest

9   factor.

10      I am going to note in this case this Defendant appears to

11  have been here at least eight months, and in that time he has

12  picked up a petty larceny.  Who knows what that was.  It could

13  have been a very minor shoplifting thing, which is what it

14  sounds like, up in New York.

15      This evading arrest case in Hudspeth County only a couple

16  of months ago is very problematic.  He also managed to be

17  driving somehow, I am assuming without a license, where he is

18  picked up for active warrants.  It could be jaywalking

19  warrants, I don't know.

20      Then, he appears to have attempted to flee here when

21  confronted by agents at the incident in question.  That's

22  keeping a little bit busy in terms of contact with law

23  enforcement in a country that you are asking asylum from.

24      I am going to find that he does pose a risk of flight, and

25  I am going to grant the Government's motion to detain.

1   Anything else, Mr. Rasmussen?

2        MR. RASMUSSEN:  No, Your Honor.  Thank you for

3   [unintelligible] on this hearing.  I appreciate it.

4        THE COURT:  Fine.

5   Anything else, Ms. Wagman?

6        MS. WAGMAN-ROMERO:  No, Your Honor.

7

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATION
_____

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:  October 3, 2024

/s/ Walter A. Chiriboga, Jr.
_____
Walter A. Chiriboga, Jr.